## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEIU HEALTHCARE PENNSYLVANIA, | : | |
| CTW, CLC, | : | |
| | : | |
| **Plaintiff** | : | **3:13-CV-02669** |
| v. | : | **(JUDGE MARIANI)** |
| | : | |
| REGIONAL HOSPITAL | : | |
| OF SCRANTON, | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM OPINION</u>

### I. Procedural History

In this Opinion, the Court addresses an issue which remained unresolved after this Court's Memorandum (Doc. 22) and Order (Doc. 23) of January 12, 2015, which granted in part and denied in part the Motion for Judgment on the Pleadings (Doc. 15) of Plaintiff, SEIU Healthcare Pennsylvania, CTW, CLC ("Union"). The Court granted the Union's Motion as to the second, third and fourth affirmative defenses of Defendant, Regional Hospital of Scranton ("Hospital"), and entered judgment in favor of the Union and against the Hospital as to those affirmative defenses, which had been raised in opposition to the Union's Complaint (Doc. 1) to enforce an arbitration award reinstating an employee of the Hospital.

The Union's Motion was denied as to the first affirmative defense of the Hospital which submitted that "[t]he award of reinstatement is contrary to Pennsylvania public policy which precludes its enforcement." (Ans. and Aff. Defenses, Doc. 9, at 5).

The Court's Order of January 12, 2015 directed the parties to file cross-motions for summary judgment "limited to the issue of whether the reinstatement of the Grievant by the Buchheit Arbitration Award is or would be contrary to Pennsylvania public policy." (Doc. 23). Further, this Court ordered the parties to "separately brief the issue of whether this Court has jurisdiction to determine the amount, if any, of back pay owing to the Grievant should this Court find the Buchheit Arbitration Award to be enforceable." Id.

The Union and Hospital have each moved for summary judgment (Docs. 24, 25) and all briefing has been completed with respect to the cross-motions. For the reasons that follow, the Hospital's Motion for Summary Judgment, which asserts that the Buchheit Arbitration Award of reinstatement "is void as contrary to well-defined public policy of the Commonwealth of Pennsylvania" (Doc. 25, ¶ 6), will be denied and the Union's Motion For Summary Judgment (Doc. 24), insofar as it seeks to confirm and enforce the Buchheit Labor Arbitration Award, will be granted. The issue of the Grievant's entitlement to back pay, if any, will be remanded to Arbitrator Buchheit. The Union's Motion for Summary Judgment, insofar as it seeks pre-judgment interest, will be deferred until Arbitrator Buchheit issues his Award on remand to him of the issue of the Grievant's entitlement to back pay. The Union's Motion for attorney's fees will be held in abeyance pending the Arbitrator's award on remand.

The procedural history of this case is otherwise recounted in this Court's Memorandum Opinion of January 12, 2015 (Doc. 22, at 1-6).

2

It suffices at this juncture to again note that the Union and the Hospital were parties to a Collective Bargaining Agreement ("CBA") for the period of November 10, 2011 through February 28, 2013. (Doc. 1, Ex. A). The CBA contained a grievance procedure which provided for the submission of unresolved disputes between the Union and the Hospital to arbitration. The CBA, in Section 4.6, provided that "[t]he award of an arbitrator hereunder shall be final, conclusive and binding upon the Hospital, the Union and the employees including all disputes regarding Management's application of the Americans With Disabilities Act." (*Id.* at 7). On February 3, 2012, the Hospital terminated the employment of employee, Roberta Robbins, on the claim that she had been sleeping on duty during the night of February 1, 2012. The Union filed a Grievance on behalf of Ms. Robbins, which asserted that she had been discharged without just cause and their discipline was imposed without the interview provided for in Section 5.2 of the Collective Bargaining Agreement.

When the parties were unable to resolve the Robbins Grievance, it was submitted to arbitration. Arbitrator Scott E. Buchheit was selected by the parties to serve as a Neutral Arbitrator to hear and decide the Grievance.

Arbitrator Buchheit conducted a hearing on December 11, 2012, and on April 26, 2013, he issued his Opinion and Award in which he sustained in part and denied in part the Robbins Grievance and issued the following Award:

### AWARD

The grievance is sustained in part and denied in part. For the sustained portion of the grievance, the Employer shall reinstate the Grievant to her

3

former position with full seniority, but without back pay or other benefits lost as a result of her termination.

(Doc. 1, Ex. B, at 37).

When the Hospital did not reinstate the Grievant, the Union brought this action to enforce the Buchheit Arbitration Award.

## II. Statement of Undisputed Material Facts

In addition to the facts which have been alleged in the Union's Complaint and admitted in the Hospital's Answer as set forth in this Court's Memorandum granting in part the Union's Motion For Judgment On the Pleadings (Doc. 22, at 1-12), the Union submitted a Statement of Material Facts in accordance with Local Rule 56.1. (Doc. 24-1). All of the Union's statements of material fact identified herein have been admitted by the Hospital. (*See* Def.'s Resp. to Pl.'s Statement of Mat. Facts, Doc. 29-2).

The paragraphs of the Union's Statement of Material Facts recite the identities of the parties to this case; the existence of a Collective Bargaining Agreement between them; the inclusion in the Collective Bargaining Agreement of a grievance and arbitration procedure which defines a "grievance" and sets forth the procedure for addressing grievances and for the submission of unresolved grievances to final and binding arbitration; and further providing that the award of an arbitrator under the grievance-arbitration procedure "shall be final, conclusive and binding upon the Hospital, the Union and the employees . . . ." (Doc. 24-1, ¶¶ 3-7). The Union's Statement of Material Facts also recites the Union's ability to contest the discharge or suspension of any employee through the grievance procedure, but

4

also notes that under Section 5.1 of the CBA, the Hospital "shall have the right to discharge,

suspend or discipline any employee for just cause." (*Id.* at ¶¶ 8-9). Paragraph 10 of the

Union's Statement of Material Facts sets forth Section 5.2 of the CBA:

> Where an employee is to be suspended or discharged, and the employee is
> required to attend a disciplinary interview, no disciplinary action shall be
> imposed until after the interview. The parties recognize that while a
> disciplinary interview normally precedes a suspension or discharge, there are
> circumstances which reasonably require immediate disciplinary action prior to
> such interview. Any employee required to attend a disciplinary interview or
> meeting shall be notified of their right to have a Union Delegate present at
> such interview or meeting and shall be given reasonable advanced notice of
> the time, place and nature of the meeting and shall be provided the right to
> have a Union representative accompany them. All discipline shall be carried
> out as soon as is reasonably possible after the Employer becomes aware of
> the facts giving rise to the discipline in question.

(*Id.* at ¶ 10).

Paragraph 11 of the Union's Statement cites Section 5.3 of the CBA, which provides:

> The Hospital and the Union agree that progressive discipline should not be
> imposed where the previous disciplinary action was more than one (1) year
> ago.

(*Id.* at ¶ 11).

The Union's Statement asserts that "Roberta Robbins was an employee of the

Hospital from November 2002 to February 2012. She worked as a CT Scan Technician.

Robbins was in a unit of employees represented by SEIU and covered by the CBA between

the parties." (*Id.* at ¶ 12). The Statement then recites that on or about February 1, 2012, the

Hospital suspended Roberta Robbins for sleeping on duty and terminated her on February

3, 2012. (*Id.* at ¶¶ 13-14). The Union then filed a Grievance protesting the termination of Ms.

5

Robbins, which stated that the Employer "in violation of, but not limited to, Article 5.1, 5.2, 5.3 – just cause, and the employee was not present at any disciplinary interview, and termination was imposed without the interview. The employee was not given advanced notice of meeting/interview." (Doc. 24-1, ¶ 15).

When the Grievance was not resolved pursuant to the grievance procedure, the Union referred the Grievance to arbitration. In accordance with the provisions of the CBA, Arbitrator Scott E. Buchheit was appointed to serve as the Neutral Arbitrator to decide the Union's Grievance. A hearing was held before Arbitrator Buchheit on December 11, 2012, at which the Union and the Hospital were permitted to present evidence and testimony with respect to the Grievance and, thereafter, to submit briefs in support of their respective positions. (*Id.* at ¶¶ 16-18).

On April 26, 2013, Arbitrator Buchheit issued his Opinion and Award with respect to the Union's Grievance over the termination of Roberta Robbins. The Arbitrator's Opinion and Award was submitted with the Union's Motion for Summary Judgment (Doc. 24-3). The Arbitrator's Award states:

### AWARD

The grievance is sustained in part and denied in part. For the sustained portion of the grievance, the Employer shall reinstate the Grievant to her former position with full seniority but without back pay or other benefits lost as a result of her termination.

(*Id.* at 37).

Arbitrator Buchheit wrote in support of his Award:

6

In short, the Grievant's termination occurred in the absence of the Employer making proper compliance with Section 5.2. The Grievant should have been afforded a "disciplinary interview", with all rights attached to such an interview, including the right to be informed that she could have a Union Delegate present during the interview, and to have such a Delegate present during the interview.

I reject the Employer's assertion that my finding that the Grievant was entitled to a disciplinary interview is a determination beyond my authority, as it results from my rewriting of the Contract. To the contrary, my conclusion results from the application of the clear and unambiguous language contained in Section 5.2. All I do is enforce the rights the Grievant had in this provision, nothing more and nothing less.

Given that the Grievant was not afforded the procedural rights to which she was entitled under Section 5.2, I cannot find that just cause existed for the Grievant's termination. It follows that the Union has won the Grievant the right to be reinstated to her former position with full seniority.

I cannot, however, reinstate the Grievant with any back pay or other benefits suffered as a result of her termination. As stressed by the Employer, sleeping on duty is a serious offense. It is particularly serious in this instance, as the Employer has a specific rule against sleeping on duty, and the Grievant had within the previous year been suspended for sleeping on duty.

It is also notable that the Grievant's sleeping was witnessed and adversely commented on by a member of the public. More specifically, when Young brought a child and his grandfather down to the Imaging Department for a scan, all of them saw the Grievant sleeping. The grandfather then made a comment to the effect of this might be the reason it had taken so long to get his grandson scanned.

Accordingly, notwithstanding the Employer and Union making every possible argument that the grievance should be denied or sustained in its entirety, the proper outcome of this case is that the grievance be sustained in part, and denied in part, as set forth above.

(*Id*. at 35-36).

7

The Arbitrator's Opinion and Award was issued to the parties through the American Arbitration Association by letter dated May 1, 2013. The Hospital received the Arbitrator's Opinion and Award prior to June 5, 2013 and, on that date, the Hospital asked Arbitrator Buchheit to reconsider his Award with respect to the reinstatement of the Grievant. The Union opposed the Hospital's Motion for Reconsideration and, by letter dated June 13, 2013, the Arbitrator denied the Hospital's Motion for Reconsideration. (Doc. 24-1, ¶¶ 21-25). The Hospital did not file, in any court, any action seeking to vacate, modify, or correct the Award of Arbitrator Buchheit. (*Id.* at ¶ 26). The Union made a demand that the Hospital comply with the Buchheit Award by reinstating the Grievant to her former position with full seniority. The Hospital has not reinstated Ms. Robbins to her former position as a CT Scan Technician. (*Id.* at ¶¶ 27-28).

The Hospital, in its own Statement of Material Facts (Doc. 25-1), has set forth 49 paragraphs, each of which cites to some portion of the Buchheit Arbitration Award.

The Union, in its Response to the Hospital's Statement of Material Facts, admits the existence of the CBA between it and the Hospital but otherwise denies all of the paragraphs of the Hospital's Statement, asserting that "[u]nder the applicable standard of review, the findings of the Arbitrator are conclusive as are any inferences to be drawn there from," while further asserting that "[t]he Buchheit Arbitration Award is a writing and speaks for itself, and, therefore no response is required." (Doc. 28-6, ¶¶ 2-25). The Union adds that "[t]o the

extent that the Hospital attempts to characterize the contents, the findings or the inferences from the Arbitration Award, such characterizations are denied." (*Id.*).[1]

There is no genuine dispute of material fact in this case. The narrow issue before this Court is whether the Buchheit Arbitration Award, directing as it does the reinstatement of Roberta Robbins who was found to have been sleeping on the job, violates a well defined and dominant public policy to be found within existing laws and legal precedents. The findings of fact made by the Arbitrator, while before the Court in the text of the Arbitration Award itself, are not to be second-guessed. In *United Paper Workers International Union, AFL-CIO v. Misco, Inc.,* the United States Supreme Court, in reaffirming the exceedingly narrow standard of review of a labor arbitrator's award, emphasized:

> Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. [*Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)]. So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect.

---

[1] The Union also specifically denies that Ms. Robbins "caused a substantial delay in the patient's care," arguing that "[a]ny delay in the patient receiving a CT scan is consistent with the fact that the night shift ER Technician who typically escorts patients to the CT Department was not at work at the time the patient was to be transported." (Doc. 28-6, ¶ 26).

484 U.S. 29, 36-37, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).

The Third Circuit, in *United States Postal Service v. National Association of Letter Carriers,* explained that:

> *Misco* specifically rejected, as exceeding the Court's reviewing authority, techniques employed by a district court in: (1) asserting a public policy without substantiating its existence within existing laws and legal precedents, and thereby failing to distinguish its pedigree as a "well defined and dominant" policy as opposed to a "general consideration of supposed public interests"; (2) second-guessing the arbitrator's fact-finding, particularly insofar as the conclusion that the asserted public policy would be violated by the employee's reinstatement depends on drawing factual inferences not made by the arbitrator; (3) second-guessing the arbitrator's reasonable construction of the "just cause" clause, and the rules of evidence and procedure appropriate to a "just cause" determination, under the collective-bargaining agreement.

839 F.2d 146, 148 (3d Cir. 1988) (internal citations omitted).

Thus, as the Court noted in *G.B. Goldman Paper Company v. United Paperworkers International Union,* 957 F.Supp. 607, 610 (E.D. Pa. 1997), "I must take the facts as found by the arbitrator" (citing *Misco,* 484 U.S. at 36).

For these reasons, the Court finds there are no disputes of material fact in this case and its inquiry is limited to the facts as found by Arbitrator Buchheit in his Opinion and Award.

## III. Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment

"should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. Rather, the opposing party must point to a factual dispute requiring trial and the district court "may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030-1031 (9th Cir. 2001); *see also Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving

11

party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

Further, both the Hospital and Union agree that, for summary judgment purposes, the Court is required to accept the facts as found by the arbitrator. "In reviewing arbitral awards on public policy grounds, a court is obligated to accept the facts as found by the arbitrator, but may review his conclusions *de novo*." (Def.'s Br. in Support of Mot. for Summ. J., Doc. 27, at 2) (collecting cases).

Similarly, the Union acknowledges that: "Findings of fact and inferences to be drawn therefrom are the exclusive province of the arbitrator." (Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J., Doc. 28, at 2) (citing *Misco*, 484 U.S. at 36, 44).

## IV. Analysis

## A. Applicable Law

Ever since the Supreme Court issued its decisions in the "*Steelworkers Trilogy*,"[2] it has been an established principle of federal labor law that "[t]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Enterprise Wheel*, 363

---

[2] *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); and *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

U.S. at 596. "As long as the arbitrator's award 'draws its essence from the collective

bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is

legitimate." *Misco*, 484 U.S. at 37 (citing *Enterprise Wheel*, 363 U.S. at 597).

These principles have been reaffirmed repeatedly by the Supreme Court, notably in

*United Paperworkers International Union v. Misco, Inc., supra,* and in *Eastern Associated*

*Coal Corporation v. United Mine Workers of America*, 531 U.S. 57, 121 S.Ct. 462, 148

L.Ed.2d 354 (2000).

The Supreme Court, however, in *W. R. Grace & Co. v. Rubber Workers,* ruled that a

court may refuse to enforce a collective bargaining agreement as well as an arbitration

award issued pursuant to the CBA when the CBA or the award issued pursuant to it violates

public policy. 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983).

*Misco* explained its decision in *W. R. Grace*, as follows:

> In *W.R. Grace*, we recognized that "a court may not enforce a collective-bargaining agreement that is contrary to public policy," and stated that "the question of public policy is ultimately one for resolution by the courts." 461 U.S., at 766, 103 S.Ct., at 2183. We cautioned, however, that a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Ibid*.

484 U.S. at 43 (emphasis in the original). The Court further explained that its decision in *W.*

*R. Grace* turned on its "examination of whether the award created any explicit conflict with

other 'laws and legal precedents' rather than an assessment of 'general considerations of supposed public interests.'" *Id.*

In *Eastern Associated Coal, supra,* the Court reiterated the standard for determining whether a labor arbitration award may be deemed to be contrary to public policy. In holding that the public policy as reflected in the Omnibus Transportation Employee Testing Act of 1991 and the Department of Transportation Regulations issued thereunder did not preclude the enforcement of an arbitration award ordering an employer to reinstate a truck driver who had twice tested positive for marijuana, the Court declared:

> The Court has made clear that any such public policy must be "explicit," "well defined," and "dominant." [*W.R. Grace*, 461 U.S. at 766]. It must be "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Ibid.* (quoting *Muschany v. United States,* 324 U. S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)); accord, *Misco, supra,* at 43, 108 S.Ct. 364. And, of course, the question to be answered is not whether Smith's drug use itself violates public policy, but whether the agreement to reinstate him does so. To put the question more specifically, does a contractual agreement to reinstate Smith with specified conditions . . . run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests? *See Misco, supra,* at 43, 108 S.Ct. 364.

531 U.S. at 62-63.

Since the decisions in *W. R. Grace*, *Misco*, and *Eastern Associated Coal*, the public policy exception to the enforcement of private sector labor arbitration awards has resulted in the vacating of arbitration awards only where the award itself, in the context of requiring the

reinstatement of an employee, violates or is in explicit conflict with a specific statute, regulation, or judicial decision.

Thus, in *Iowa Electric Light and Power Company v. Local 204 of the International Brotherhood of Electrical Workers*, the Eighth Circuit affirmed the District Court's vacating of the arbitrator's award on public policy grounds which had reinstated an employee who, because he had a cast on one of his legs as a result of a recent accident, "short circuit[ed] an important safety system required by the federal government as a measure to protect the public from exposure to harmful radiation." 834 F.2d 1424 (8th Cir. 1987). Specifically, the employee, in an effort to leave early for lunch "to avoid the noon crowd," had a fuse pulled which defeated the interlock door system at the nuclear power plant where the employee worked. The interlock door system was designed so that only one door in each air lock compartment could be opened at a time so that when one door is opened, all other doors are automatically locked until the first one is closed. *Id.* at 1426. The Court found that "there is a well defined and dominant national policy requiring strict adherence to nuclear safety rules." *Id.* at 1427.

The Court found this public policy to be evident in the comprehensive and specific safety regulations adopted by the Nuclear Regulatory Commission ("NRC"), which it noted "has promulgated volumes of safety rules that govern all nuclear power plants. *See, e.g.*, 42 U.S.C. § 2131-41; 10 C.F.R. pt. 50." *Id.* at 1428. The Court noted that each nuclear power plant "develops its own more detailed specifications and regulations in order to obtain and

15

then maintain its federal license." *Id.* In this case, the Company's "Technical Specification

Section 3.7.c.1" delineated the requirements for "secondary containment integrity." *Id.*

When the NRC was notified of the employee's violation of Technical Specification

Section 3.7.c.1, it issued an inspection report that approved of the Cornpany's discharge of

the employee and included a written reprimand to the Company for compromising

secondary containment. The Court, in view of this, stated:

> Therefore, it is clear that when Schott breached the technical plant
> specification – required by the NRC, as mandated by Congress – he violated
> more than a simple in-house procedure. Instead, he broke a safety rule that
> was put in place pursuant to a strict regulatory scheme devised by Congress
> for the protection of the public from the hazards of nuclear radiation.

*Id.* at 1428.

In refusing to enforce the arbitration award ordering the employee's reinstatement,

the Court nevertheless cautioned:

> Our holding today should not be read as a blanket justification for the
> discharge of every employee who breaches a public safety regulation at a
> nuclear power plant. There may be circumstances under which a violation
> rnight be excused. But in this case, Schott's violation of the safety rule was
> serious. Nor, as the Union contends, was it an unknowing violation.

834 F.2d at 1429.

In this Circuit, labor arbitration awards reinstating seamen, who operated a vessel

while under the influence of drugs or alcohol in violation of Coast Guard Regulations have

been denied enforcement under the public policy exception. In *Exxon Shipping Company v.*

*Exxon Seamen's Union,* 993 F.2d 357 (3d Cir. 1993) ("*Exxon I*"), when a 635-foot oil tanker

16

ran aground in the Mississippi River, its helmsman tested positive for marijuana. The Board of Arbitration found that the helmsman had not violated Paragraph 1 of Exxon's drug policy which prohibited the "use, possession, distribution or sale of illicit or unprescribed drugs on Company business or premises," because "there was no evidence he had used or possessed drugs on company business or premises." *Id.* at 359.

In affirming the District Court's vacating of the arbitration award reinstating the helmsman, as violative of public policy, the Court focused on the Coast Guard Regulations under which the helmsman was tested for drugs at 46 C.F.R. part 16. The Court cited 46 C.F.R. § 16.201(c), which provided that an individual who tests positive for drugs "shall be denied employment as a crewmember or removed from duties which directly affect the safety of the vessel's navigation or operations as soon as practicable and shall be subject to suspension and revocation proceedings against his or her license, certificate of registry, or merchant mariner's document . . ." 46 C.F.R. § 16.201(c).

In such circumstances the Court noted that the individual "may not then return to work aboard a vessel unless the medical officer determines that 'the individual is drug-free and the risk of subsequent use of dangerous drugs by that person is sufficiently low to justify his or her return to work.' 46 C.F.R. § 16.370(d)." *Exxon I*, 993 F.2d at 361.

Thus, the Court held:

> the Award reinstating Foster violates the public policy protecting the public and the environment against operation of vessels by drug users. It would undermine the regulations' stated purpose "to minimize the use of intoxicants by merchant marine personnel and to promote a drug-free and safe work

environment," 46 C.F.R. § 16.101(a). Reinstating Foster would thwart achievement of the overriding interest in public safety furthered by the regulations.[3]

*Id.* at 364.

In *Exxon Shipping Company v. Exxon Seamen's Union,* 11 F.3d 1189 (3d Cir. 1993) ("*Exxon II*"), Exxon discharged a seaman who, after returning to the ship and reporting for duty, was administered a breathalyzer test which revealed a blood alcohol content more than three times the maximum permitted by the Memorandum of Understanding between Exxon and the Union representing its employees and by Coast Guard Regulations at 33 C.F.R. §§ 95.020(b), 95.050(b), 95.055. 11 F.3d at 1190-91. The Union grieved his discharge and the three-member arbitration panel, while agreeing that the employee had been intoxicated when he boarded the Exxon vessel, found that discharge was not required. The panel relied on the employee's good record and its conclusion that the employee should have been given "an opportunity to demonstrate that the events . . . were an aberration, and that they would not occur again." *Id.* at 1191.

The Court of Appeals, relying on its decision in *Exxon I, supra,* held that:

---

[3] The Court took pains to point out that its decision was based on "positive law" stating:
As noted above, the Coast Guard regulations, 46 C.F.R. part 16, their authorizing statute, 46 U.S.C. § 7704(c), and case law are all sources of positive law bearing on this problem. Where, as here, the arbitration panel found that Foster had used marijuana, but required Exxon to reinstate Foster to his "former position" without also finding that he had been "cured" or rehabilitated, the award requiring Foster's reinstatement is contrary to a "well defined and dominant" public policy. *W. R. Grace & Co.,* 461 U.S. at 766, 103 S.Ct. at 2183. *See also, Misco,* 484 U.S. at 43, 108 S.Ct. at 373.
*Exxon I,* 993 F.2d at 364 n.7.

The award in question in this case violates a public policy that is both well defined and dominant viz., that an owner or operator of an oil tanker should not be compelled to reinstate to a "safety-sensitive" position an individual who has been found to be intoxicated while on duty on that vessel.

Id. at 1194.

The Court noted that in Exxon I, it had identified in the Coast Guard Regulations and other provisions of federal law, "'a "well-defined and dominant" public policy against the operation of a vessel under the influence of drugs or alcohol' . . . and we concluded that the arbitration award violated this policy." Id. at 1193.

In vacating the arbitration award which ordered the reinstatement of the employee, the Court founded its decision on the public policy expressed in the Coast Guard Regulations at 33 C.F.R. § 95.035, which permit testing for alcohol or drugs when a crew member is involved in an accident or is suspected of being intoxicated as well as the provision in 33 C.F.R. § 95.055, that a crew member "who is intoxicated while on duty is guilty of a crime and is liable for a civil penalty." Id. at 1195. It also made reference to Section 95.050(b) of 33 C.F.R., noting that "[m]arine employers are prohibited from allowing an intoxicated individual to 'stand watch or perform other duties.'" Id.

Thus, the Court's decision was squarely grounded in the explicit public policy expressed in the Coast Guard Regulations which have as their objective the removal of seamen on vessels who reported for duty in an intoxicated state or who tested positive for drugs or alcohol. The Court concluded that "there is a well defined and dominant policy that owners and operators of oil tankers should be permitted to discharge crew members who

19

are found to be intoxicated while on duty. An intoxicated crew member on such a vessel can

cause loss of life and catastrophic environmental and economic injury." *Exxon II*, 11 F.3d at

1196.

The Court in *Exxon II* cited to its prior decision in *Stroehmann Bakeries v. Local 776

International Brotherhood of Teamsters,* 969 F.2d 1436 (3d Cir. 1992), *cert. denied* 506 U.S.

1022, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992). There, the employer discharged a

deliveryman after determining that he had sexually harassed a customer's employee. An

arbitrator ordered the deliveryman's reinstatement but did not decide whether the sexual

harassment had actually occurred. Instead, the arbitrator concluded that the employer had

not made an adequate investigation. The Court in *Exxon II* explained its decision in

*Stroehmann*, again showing that its decision to vacate an arbitrator's award was undertaken

only after a determination that it violated public policy:

> Looking to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e -2(a)(1)
> (1988), an Equal Employment Opportunity Commission regulation, 19 C.F.R.
> § 1604-11(a) (1993), the Supreme Court's decision in *Meritor Savings Bank v.
> Vinson,* 477 U.S. 57, 64-67, 106 S.Ct. 2399, 2404-06, 91 L.Ed.2d 49 (1986),
> and other authorities, we found that "[t]here is a well-defined and dominant
> public policy concerning sexual harassment in the workplace." *Stroehmann
> Bakeries,* 969 F.2d at 1441-42. We also found that there is a "well-defined,
> dominant public policy favoring voluntary employer prevention and application
> of sanctions against sexual harassment in the workplace." *Id.* at 1442. We
> then held that "an award which fully reinstates an employee accused of
> sexual harassment without a determination that the harassment did not occur
> violates public policy." *Id.*

*Exxon II*, 11 F.3d at 1192. *See also, Highlands Hosp. and Health Ctr. v. Am. Fed'n of State,

Cnty and Mun. Emps.*, 1996 WL 163947 (W.D. Pa. 1996) (well defined and dominant public

20

policy requiring hospitals to protect their mental health patients from abuse/harm as

reflected in 42 U.S.C. § 9501, *et seq.*, Mental Health Rights and Advocacy, 42 U.S.C. §

10801, *et seq.*, Protection and Advocacy for Mentally Ill Individuals, 50 P.S. 7102, *et seq.*,

Pennsylvania Mental Health Procedures Act, and 28 Pa. Stat. § 103.21, *et seq.*, patient's bill

of rights was violated where arbitration award reinstated a patient care assistant in the

hospital's mental health unit who pushed an 83-year-old Alzheimer patient across a hall into

an opposing wall).

Other courts have vacated arbitration awards as violative of public policy where

reinstatement was ordered of an employee who committed serious safety violations or who

operated an airplane while intoxicated. *See,e.g., Amalgamated Meat Cutters v. Great W.*

*Food Co.,* 712 F.2d 122, 125 (5th Cir. 1983) (vacating an arbitration award reinstating an

over-the-road truck driver who drank alcohol while on duty); *Delta Air Lines, Inc. v. Air Line*

*Pilots Ass'n Int'l,* 861 F.2d 665, 674-675 (11th Cir. 1988), *cert. denied* 493 U.S. 871, 110

S.Ct. 201, 107 L.Ed.2d 154 (1989) (vacating an arbitration award that reinstated a pilot who

flew while intoxicated).

Yet, where the reinstatement of a discharged employee pursuant to a labor

arbitration award has not been found to be in violation or in explicit conflict with a "well-

defined and dominant" public policy as expressed in statute, regulation or case law, the

courts have not hesitated to enforce such awards of reinstatement. In *United States Postal*

*Service v. National Association of Letter Carriers, supra*, the Court reversed the district court

which had vacated an arbitrator's award directing the reinstatement of an employee who had fired gun shots at his postmaster's empty parked car, damaging the windshield, dashboard and front seat. Concluding that the decision of the Supreme Court in *Misco* was controlling, the Court held that "[e]ven assuming, *arguendo*, that there is a public policy against permitting an employee to direct physical violence against a superior, the district court erred in setting aside the arbitrator's order of reinstatement." 839 F.2d at 149. The Court noted that the arbitrator had determined "that the facts indicated that upon return to work Mr. Jackson showed no proclivity to further aggression." *Id.* Accordingly, it concluded:

> Therefore, a policy in favor of protecting co-workers and customers from Mr. Jackson's violent conduct (assuming, *arguendo*, that such a policy is properly ascertained) does not *require* his discharge for its fulfillment.

*Id.* at 149-150.

The Court's holding was based in large part upon its reading of *Misco* as "specifically reject[ing], as exceeding the court's reviewing authority, techniques employed by a district court in: (1) asserting a public policy without substantiating its existence within existing laws and legal precedents and thereby failing to distinguish its pedigree as a 'well defined and dominant' policy as opposed to a 'general consideration of supposed public interests. . . .'" *Id.* at 148.

The Circuit again confronted the public policy ground for vacating a labor arbitration award in *United Transportation Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376 (3d Cir. 1995). There, a bus driver was discharged after he had a rear end collision with a

tractor trailer which he had been tailgating. The driver had been involved in 24 accidents in his 12 years of employment, nine of which were deemed preventable, and the accident for which he was discharged was his third preventable rear end collision. *Suburban Transit*, 51 F.3d. at 379.

The Union grieved his discharge and the matter proceeded to arbitration. The arbitrator ruled that the employee was responsible for the accident but discharge was "too harsh a sanction for a long term employee where the employee had been afforded no opportunity to improve his driving skills through a retraining program." *Id.* The Union moved to enforce the award and the employer moved to vacate it in district court. The district court granted the employer's motion to vacate the award on the basis that the arbitrator had exceeded his authority under the CBA.

The Court of Appeals reversed. In addition to finding that the arbitrator's interpretation of the term "proper cause" was within his authority and presented a legitimate reading of that phrase in the CBA, it also found that the award did not violate public policy. Suburban had argued that public policy required that common carriers "provide safe carriage to their passengers, and that the arbitration award undermines this policy." *Id.* at 381. The Court, citing its prior decisions in *United States Postal Service, supra,* and *Service Employees Int'l Union Local 36 v. City Cleaning Company, Inc.*, 982 F.2d 89 (3d Cir. 1992), noted that the public policy exception to the enforcement of arbitration awards "is slim

indeed." The Court emphasized that "[t]he exception is available only when 'the arbitration decision and award create an explicit conflict with an explicit public policy. . . ." *Id.* at 382.

Further, citing its decision in *Letter Carriers, supra,* it noted even where a policy is assumed to exist, such as a policy of protecting co-workers and customers from an employee's violent conduct, the inquiry must be whether the policy *requires* the employee's discharge. *Id.* (citing *Letter Carriers*, 839 F.2d at 149-150).

The Court's reasoning in *Suburban Transit* in reversing the district court with instructions to confirm the arbitration award is encapsulated as follows:

> We acknowledge that public transportation safety is a valid public concern, but Suburban has failed to demonstrate that public policy requires vacation of the arbitrator's award here. Suburban has not provided us with "laws and legal precedents" which describe an "explicit" public policy; rather, what Suburban has described as putative public policy is more akin to the amorphous "public interests" that were deemed insufficient to articulate public policy in *W.R. Grace*. Furthermore, even if we found that Suburban had articulated a public policy which could, in some cases, undermine an arbitration award, we still would not vacate the award here. Suburban simply has not shown that the arbitrator's award in this case would explicitly conflict with the public policy championed by the company. Nagy has obviously had many accidents, but he has also won a number of safety awards. Additionally, the arbitrator's award seeks to encourage driver retraining; thus, it seems that the arbitrator had an eye toward public safety when he rendered his decision. Therefore, Suburban's public policy argument fails to persuade us that the arbitrator's award must be vacated.

*Suburban Transit,* 51 F.3d at 382.

## B. <u>Application of the Public Policy Exception to the Enforcement of a Labor Arbitration Award to the Buchheit Award Reinstating the Grievant</u>

The Hospital moves for summary judgment, contending that Robbins "had job duties related to the safe operation of the Hospital and care of its patients." (Doc. 27, at 7). The Hospital argues that Robbins "was responsible for ensuring that the Hospital's patients received timely medical care in the form of CT scans." (*Id.*). It argues that the Hospital would face "significant potential civil liability if Robbins (or any other employee with a history of sleeping on shift) were ultimately responsible for an adverse patient outcome." (*Id.*). It further argues that the CT scan "is often the test of choice in diagnosing urgent and emergent conditions" and that "a significant delay in the identification of emergent medical conditions, including internal injuries, could have catastrophic effects." (*Id.* at 8).

In support of its claim that the reinstatement of Robbins violates "Pennsylvania positive law," the Hospital argues that the regulations promulgated by the Pennsylvania Department of Health require the Hospital "to ensure that patients are not placed at risk by untrained or incompetent operators of radiographic equipment." (*Id.*). The Hospital cites to 28 Pa. Code § 127.21, which states:

> The hospital shall ensure that all radiographic equipment is operated at all times by competent personnel under physician supervision and trained in the use of radiographic equipment and in safety precautions. Nonportable equipment shall be operated only in properly shield spaces. Caution shall be exercised in using portable equipment to protect employees, patients, and other persons from exposure to radiation.

28 Pa. Code § 127.21.

The Hospital also makes reference to the requirement that scan technologists are required to be "either registered or eligible for registration by the American Registry of Radiologic Technologists (ARRT). 28 Pa. Code § 127.5." (Doc. 27, at 8). Thus, the Hospital argues that the Pennsylvania Department of Health ("DOH") regulations which it cites "reflect a public policy of the Commonwealth that only trained, certified, and competent personnel shall be permitted to operate radiographic equipment." (*Id.* at 9). From this premise, the Hospital concludes that "[c]ompelled reinstatement of a CT Scan Technician with a demonstrated history of chronic inattention and fatigue, who has affirmatively jeopardized patient care, would violate public policy because it would force the Hospital into potential noncompliance." (*Id.*). The Hospital also argues that the reinstatement of Robbins would present an "unacceptable degree of risk to the general public." (*Id.*). In support of this argument, the Hospital again cites to the Pennsylvania DOH regulations, specifically, 28 Pa. Code §§ 127.2, 127.4 and 127.5.[4]

---

[4] 28 Pa. Code § 127.2 provides: "The hospital shall provide radiographic and fluoroscopic diagnostic services adequate to meet the needs of patients."

> Section 127.4 provides:
> (a) Radiotherapy services provided in the hospital shall be operated safely and effectively. Provisions shall be made for safe storage and use of radium and other radioactive sources. The services of a radiation physicist or of a competently trained dosimetrist shall be available, as needed, for consultation, for supervision of radiation safety procedures, and for participation in educational programs. Radiological technologists and other personnel shall be available to meet patient needs. . . .
> Section 127.5 provides:
> There shall be at least one radiologic technician registered or eligible for registration by the American Registry of Radiologic Technologists on duty or available when needed. Work assignments shall be in accordance with written job descriptions and employe [*sic*] qualifications.

The Hospital argues that these regulations reflect "as a matter of public policy, radiographic technologists cannot adequately meet the needs of the general public unless they are available to treat patients on an as-needed basis." (*Id.* at 10-11). The Hospital then argues that "[w]hile sound asleep with a stat CT order for a minor child pending, Robbins clearly was not 'available when needed.'" (*Id.* at 11).

Moving away from regulations issued by the Commonwealth of Pennsylvania, the Hospital then argues that the Grievant was not in compliance with the Standards of Ethics imposed by "her own professional certification body, the ARRT." (Doc. 27, at 11). The Hospital argues that Robbins' act of falling asleep was "unprofessional conduct" and it further argues that AART's Rules of Ethics forbid "practicing while impaired by way of any mental or physical condition", which the Hospital asserts occurred here because of the Grievant's "sleep deprivation." (*Id.*).

Thus, the Hospital argues that the Pennsylvania DOH Regulations and the AART's Rules and Regulations and Ethical Standards "reflect a clear and well-defined public policy of this Commonwealth to protect patients from the risks associated with incompetent, unqualified, unethical, or otherwise unavailable radiographic operators." (*Id.* at 12).

The Union, in its cross-motion for summary judgment, initially responds by stating that even if the Court were to find a public policy in workplace safety or patient safety, "the Award (which imposes an approximately fourteen month unpaid suspension on the Grievant) does not violate that public policy." (Doc. 28, at 10). The Union also argues that

the Hospital's arguments concerning patient safety were not raised before the Arbitrator and are not supported by the Award, relying on *G.B. Goldman Paper Company, supra.* (*Id.*). The Union further disputes the Hospital's claim that the Grievant was responsible for the alleged delay in patient care, arguing that the Arbitrator made such no finding. In addition, the Union argues that "there is no factual basis in the Award that the Grievant had a 'history of chronic inattention and fatigue.'" (*Id.* at 12). The Union notes that there was a single incident in 2011 in which the Grievant was suspended for one day for alleged sleeping on duty and no intervening discipline until her termination. (*Id.* at 12-13).

The Union argues that the provisions of 28 Pa. Code § 127.5 were not violated since the Grievant was "on duty at her station and available," and "[e]ven if she was considered not available, there was another radiologic technician on duty, namely, X-Ray Technician Young." (*Id.* at 13). With respect to the ARRT Rules and Regulations and Standards of Ethics, the Union submits that they do not establish a "relevant public policy." (*Id.*). The Union emphasizes that neither the AART Rules and Regulations nor the Standards of Ethics "provides that an incident of sleeping constitutes grounds for revoking certification or registration." (Doc. 28, at 13-14). The Union points out that the Grievant has maintained her certification "before, during and after her termination from the Hospital." (*Id.* at 14 (citing Affidavit of Roberta Robbins, SEIU Ex. E, ¶¶ 3-6)). The Union disputes the Hospital's claim that the AART's Rules "expressly forbid" the Grievant's "practicing while being sleep

28

deprived." Instead, the Union argues that the Rules "do not contain the terms 'sleep deprivation,' 'sleeping,' or 'fatigue.'" (*Id.*).

The Union dismisses the argument made by the Hospital that fatigue is the equivalent of intoxication as "unfounded," arguing that this so-called "equivalency" is not found in the Pennsylvania Regulations or in the ARRT Standards. Further, the Union points out that there is a work rule against being intoxicated during working hours but it was not cited by the Hospital in support of its discharge. Similarly, the Union points to the Buchheit Arbitration Award and asserts that the Grievant was not charged with violating any safety rules of the Hospital. Thus, it argues: "[i]f fatigue among healthcare professionals disqualifies them from employment, thousands of hospital employees would need to be removed." (*Id.*). The Union concludes its argument with its statement that "[t]here is no public policy applicable to this case"; that "the Award does not violate public policy"; that "Arbitrator Buchheit imposed a lengthy unpaid suspension on the Grievant" and "[t]hus, the Award did not condone misconduct." The Union accordingly asserts there is no basis to vacate the Award. (*Id.* at 21).

The Supreme Court's decision in *Eastern Associated Coal, supra,* provides a clear and comprehensive analytical framework within which to resolve the clash of arguments between the parties in this case. In *Eastern Associated Coal*, the Court enforced the award of a labor arbitrator who ordered an employer to reinstate an employee truck driver who had twice tested positive for marijuana. The Court held that considerations of public policy did

not require a refusal to enforce the arbitration award. The Court affirmed the Court of

Appeals which had enforced the award which required the employer to reinstate the

discharged employee.

The case turned in large measure on the Department of Transportation ("DOT")

Regulations, codified at 49 C.F.R. §§ 382.301, 382.305, requiring random drug testing of

workers engaged in "safety-sensitive" tasks. *Eastern Associated Coal*, 531 U.S. at 60.

When Smith, a truck driver, tested positive for marijuana, his employer, Eastern Associated

Coal, sought to discharge him. The Union submitted the matter to arbitration and the

arbitrator concluded that Smith's positive drug test did not amount to "just cause" for

discharge. Instead, the arbitrator ordered Smith's reinstatement, adding conditions that

Smith accept a suspension of 30 days without pay, participate in a substance abuse

program and undergo drug tests for the next five years. *Id.* The employee passed four

random drug tests but again tested positive for marijuana thereafter. His employer again

sought to discharge him. The Union again sought arbitration and the arbitrator again

concluded that Smith's use of marijuana did not amount to just cause in light of two

mitigating circumstances. Those were that Smith "had been a good employee for 17 years"

and that Smith "had made a credible and 'very personal appeal under oath . . . concerning a

personal/family problem which caused this one time lapse in drug usage.'" *Id.* The

reinstatement ordered by the arbitrator provided that the grievant be suspended without pay

for a period slightly more than three months; that he reimburse his employer and the Union

for the cost of both arbitration proceedings; that he continue to participate in a substance abuse program; that he continue to undergo random drug testing and provide Eastern Associated Coal with a signed undated letter of resignation to take effect if Smith again tested positive within the next five years. *Id.* at 60-61. The employer brought suit to vacate the award arguing that it contravened a public policy against the operation of dangerous machinery by workers who test positive for drugs. The District Court ordered the award's enforcement and the Court of Appeals affirmed.

The Supreme Court affirmed the Court of Appeals and ordered the enforcement of the arbitration award with its provision for reinstatement of the grievant. It addressed the claim that the grievant's reinstatement was contrary to public policy. In so doing, it first stated:

> And, of course, the question to be answered is not whether Smith's drug use itself violates public policy but whether the agreement to reinstate him does so. To put the question more specifically, does a contractual agreement to reinstate Smith with specified conditions . . . run contrary to an explicit, well-defined and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests? *See, Misco, supra,* at 43, 108 S.Ct. 364.

*Id.* at 62-63.

The employer argued that the Omnibus Transportation Employee Testing Act of 1991 and the DOT implementing regulations presented a "strong public policy against drug use by transportation workers in safety-sensitive positions and in favor of random drug testing in order to detect that use." *Id.* at 64. Thus, Eastern Associated Coal argued that

31

reinstatement of a driver who had twice failed random drug tests would undermine that policy to the point where an arbitration award directing such reinstatement must be "set aside." *Id.*

The Court rejected this argument, noting that the provisions of the Act provided that "rehabilitation is a critical component of any testing program." *Eastern Associated Coal*, 531 U.S. at 64. Further, the Court noted that the DOT Regulations specifically stated that a driver who has tested positive for drugs "cannot return to a safety-sensitive position until (1) the driver has been evaluated by a 'substance abuse professional' to determine if treatment is needed, 49 C.F.R. § 382.605(b) (1999); (2) the substance-abuse professional has certified that the driver has followed any rehabilitation program prescribed, § 382.605(c)(2)(i); and (3) the driver has passed a return-to-duty drug test, § 382.605(c)(1)." *Id.* The Court also noted a provision for at least six random drug tests during the first year after returning to the job.

In light of these provisions, the Court in its analysis of the public policy issue, stated:

Neither the Act nor the regulations forbid an employer to reinstate in a safety-sensitive position an employee who fails a random drug test once or twice. The congressional and regulatory directives require only that the above-stated prerequisites to reinstatement be met.

*Id.* at 65.

Next, the Court noted that the award of reinstatement was not contrary to the policies against drug use by employees in safety-sensitive transportation positions and in favor of drug testing. Thus, the Court observed:

> The award does not condone Smith's conduct or ignore the risk to public safety that drug use by truck drivers may pose. Rather, the award punishes Smith by suspending him for three months, thereby depriving him of nearly $9,000 in lost wages, . . .; it requires him to pay the arbitration costs of both sides; it insists upon further substance-abuse treatment and testing; and it makes clear (by requiring Smith to provide a signed letter of resignation) that one more failed drug test means discharge.

*Id.* at 65-66.

The Court found that the award "violates no specific provision of any law or

regulation." *Id.* at 66. Further, the Court noted that the fact that Smith was a "recidivist – that

he has failed drug tests twice – is not sufficient to tip the balance in Eastern's favor. The

award punishes Smith more severely for his second lapse." *Id.*

The Court emphasized that while Congress had enacted a detailed statute and had

delegated to the Secretary of Transportation authority to issue further detailed regulations

on the subject of drug use by persons in safety-sensitive positions,

> Neither Congress nor the Secretary has seen fit to mandate the discharge of a worker who twice tests positive for drugs. We hesitate to infer a public policy in this area that goes beyond the careful and detailed scheme Congress and the Secretary have created.

*Eastern Associated Coal*, 531 U.S. at 67. The Court accordingly concluded:

> We cannot find in the Act, the regulations, or any other law or legal precedent an "explicit," "well defined," "dominant" public policy to which the arbitrator's decision "runs contrary."

*Id.*

In this case, neither the Pennsylvania DOH Regulations cited by the Hospital nor the

ARRT Regulations or Standards of Ethics forbid an employer to reinstate in a safety-

sensitive position (assuming that a CT Scan Technician is such a position) who falls asleep on the job once or twice.

Further, the Buchheit Award, like the Award in *Eastern Associated Coal*, does not condone Robbins' conduct or ignore the risk to hospital or patient safety that falling asleep on the job may pose. Instead, the Buchheit Award punishes Robbins by suspending her for what the Union asserts is a period of 14 months without pay or benefits. (Pl.'s Br. in Supp. of Mot. for Summ. J., Doc. 26, at 17).

The Buchheit Award violates no specific provision of any law or regulation. The regulations cited by the Hospital do not provide or suggest otherwise. 28 Pa. Code §127.21's statement that the Hospital "shall ensure that all radiographic equipment is operated at all times by competent personnel under physician supervision and trained in the use of radiographic equipment and in safety precautions," cannot reasonably be said to have been violated in this case. It is undisputed that Roberta Robbins has obtained certification from ARRT and has maintained her ARRT certification during her employment with the Hospital and subsequent to her termination. (Affidavit of Roberta Robbins, Doc. 32, ¶¶ 4-6). To accept the Hospital's argument that because Robbins fell asleep on one or more occasions, she is not "competent" within the meaning of Section 127.21 is to unreasonably expand the definition of "competent" far beyond what the plain language of Section 127.21 requires and the purpose behind it. Clearly, Section 127.21 addresses technical competency, requiring that radiologic equipment be operated by "competent personnel

34

under physician supervision and trained in the use of radiographic equipment and safety precautions." The Hospital reaches too far in its attempt to read this regulation as declaring an employee incompetent because she has committed the error of falling asleep on the job.

28 Pa. Code § 127.2 provides only that the Hospital "shall provide radiographic and fluoroscopic diagnostic services adequate to meet the needs of patients." Again, this provision cannot be reasonably extrapolated to mean that the Hospital is forbidden to reinstate Robbins as a CT Scan Technician.

Similarly, Section 127.4 of 28 Pa. Code, while beginning with the statement, "[r]adiotherapy services provided in the hospital shall be operated safely and effectively," and requiring that provisions "be made for safe storage and use of radium and other radioactive sources," and requiring that radiologic technologists and other personnel "shall be available to meet patient needs," does not expressly or by any reasonable implication forbid the Hospital from reinstating the Grievant in a CT Scan Technician position. This is particularly the case here where the Buchheit Award makes no finding that the Grievant did not operate radiotherapy services "safely and effectively." Indeed, the Buchheit Award, given the facts as found by the Arbitrator, is confined to the Grievant having fallen asleep on the job and does not find that Robbins' conduct occurred in such a way as to threaten the safe and effective operation by the Grievant of any radiotherapy services provided by the Hospital. The same analysis applies to 28 Pa. Code § 127.5's provisions. That section states only that "[t]here shall be at least one radiologic technician registered or eligible for

registration by the American Registry of Radiologic Technologists on duty or available when needed. . . ." This provision is directed at a hospital staffing requirement and may not reasonably be said to forbid the reinstatement of the Grievant as directed by Arbitrator Buchheit.

Nor do the ARRT Rules and Regulations or the ARRT Standard of Ethics (Docs. 27-2, 27-3) prohibit the enforcement of the Buchheit Award directing the reinstatement of the Grievant. This is so even assuming that the ARRT Rules and Regulations and Standard of Ethics have the force of law sufficient to meet the test that public policy is to be "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests,'" *Misco,* 484 U.S. at 43. The Hospital characterizes the ARRT as the Grievant's "own professional certification body" (Doc. 27, at 11), and argues that the Pennsylvania DOH Regulations "require by incorporation compliance with ARRT's regulations and ethical standards [to] reflect a clear and well-defined public policy of this Commonwealth to protect patients from the risks associated with incompetent, unqualified, unethical, or otherwise unavailable radiographic operators" (Doc. 27, at 12). Yet the Hospital has not cited to any authority to support its assertion that the DOH Regulations require by incorporation compliance with the regulations and ethical standards of ARRT. However, even if it is assumed that such incorporation is expressly memorialized in the Pa. Code or to be implied by the provision in Section 127.5 that there shall be at least one radiologic technician registered or eligible for registration by the AART on duty or available when

36

needed, such an incorporation does not support the Hospital's claim of a violation of a

public policy. This is so because, again, the ARRT Rules and Regulations and its Standards

of Ethics (Docs. 27-2, 27-3) do not forbid the reinstatement of a certified CT Scan

Technician because she has fallen asleep on the job. The ARRT Standards of Ethics lists,

in Section B., 22 separate examples of conduct or activities deemed to be a violation of the

ethical rules for which "Certificate Holders" who engage in or who permit the proscribed

conduct are "subject to sanctions". (Doc. 27-3). The sanctions include suspension of the

violator's certification, with provisions for an administrative hearing. But the Standards of

Ethics do not prohibit the reinstatement of a CT Scan Technician and do not require the

employer of the technician to refuse to reinstate the technician when directed by a labor

arbitration award. Moreover, as noted, Roberta Robbins has maintained her certification

during all times relevant this case and continues to do so. Thus, this is not a case where the

Grievant may not be reinstated because she has lost her ARRT certification. Nor does the

Arbitration Award find as a fact that Robbins' conduct violated any provision of the ARRT

rules or ethical standards.

Moreover, the fact that Robbins, like the grievant in *Eastern Associated Coal*, 531

U.S. at 66, has engaged in the conduct for which she was discharged on more than one

occasion, "is not sufficient to tip the balance" in the Hospital's favor.

The decision in *Eastern Associated Coal* turns on the Court's conclusion that,

although Congress enacted the Omnibus Transportation Employee Testing Act of 1991 and

the Secretary of Transportation had promulgated implementing regulations requiring drug

testing of operators of commercial motor vehicles and providing for suspensions of those

operators who had driven a vehicle under the influence of drugs, "[n]either Congress nor the

Secretary has seen fit to mandate the discharge of a worker who twice tests positive for

drugs." *Eastern Associated Coal*, 531 U.S. at 67. The Court expressed its hesitation "to infer

a public policy in this area that goes beyond the careful and detailed scheme Congress and

the Secretary have created." *Id.*

So, too, in this case, the Commonwealth of Pennsylvania, even if this Court makes

what it believes is the unwarranted assumption that the ARRT Rules and Regulations and

Standards of Ethics are entirely incorporated into the regulations promulgated by the

Pennsylvania DOH, has not seen fit to mandate the discharge or bar the reinstatement of a

CT Scan Technician who twice fell asleep on the job. This Court does not find in the laws of

the Commonwealth of Pennsylvania or the DOH Regulations an "explicit," "well-defined,"

"dominant" public policy to which Arbitrator's Buchheit's decision runs contrary. *Id.* (citing

*Misco*, 484 U.S. at 43; *W.R. Grace*, 461 U.S. at 766). This conclusion is consonant with

other decisions addressing attempts to deny enforcement to a labor arbitrator's award in the

healthcare field on the basis of public policy.

Thus, in *MidMichigan Regional Medical Center-Clare v. Professional Employees

Division of Local 79, Service Employee International Union,* 183 F.3d 497 (6th Cir. 1999),

the hospital brought suit to set aside an arbitrator's decision ordering the hospital to

reinstate a staff nurse who was found by the arbitrator to have been negligent in the operation of a defibrillation machine in the course of resuscitating a patient who had suffered cardiac arrest. The Court noted that the arbitrator found that the employee had "negligently failed to switch from pacer mode to defibrillation mode," thereby delaying the ultimately successful defibrillation. *MidMichigan,* 183 F.3d at 500.

The Court noted that it was "uncontested that Michigan has a 'well-defined and dominant' policy of ensuring safe and competent nursing care." *Id.* at 504. The Court characterized the issue before it as "whether requiring a hospital to reinstate a nurse who was found by an arbitrator to have been negligent violates that policy." *Id.*

In finding that public policy would not be violated by the nurse's reinstatement, the Court stated:

> Even highly skilled professionals err on occasion, and we think it clear that it cannot violate the public policy of Michigan to contract to retain a nurse guilty of committing some acts of carelessness.

*Id.* The Court, accordingly, held:

> We conclude that it is not against the established public policy of Michigan to require a hospital to reinstate a nurse who has committed isolated acts of negligence. Thus, the CBA in this case, which so requires, is valid and the arbitrator's award of reinstatement will not be overturned on public policy grounds.

*Id.* at 506.

Here, the Arbitrator found without question that Ms. Robbins was sleeping, noting that:

Evidence at the arbitration hearing established that not only was the Grievant working full time with the Hospital, she also had a per diem job with another employer, as well as personal matters that needed her attention. Given the burdens on the Grievant, it is perhaps understandable, but certainly not acceptable, that she would have fallen asleep due to sleep deprivation.

(Doc. 24-3, at 30-31).

Like the nurse in *MidMichigan Regional Medical Center, supra,* Ms. Robbins erred and the Arbitrator did not find that her succumbing to sleep was an intentional act of rule defiance. Her error, in that sense, is akin to the negligence of the nurse in *MidMichigan.*

Similarly, in *Boston Medical Center v. Service Employees International Union, Local 285,* 260 F.3d 16 (1st Cir. 2001), the hospital sought to vacate an arbitration award which required it to reinstate a nurse who was discharged following the death of a four-month-old infant under her care and, to do so without back pay. The Court recognized the existence of a public policy to protect patients by requiring nurses to be "qualified" and "competent". The Court noted that the hospital had identified "a number of statutes, regulations and cases to support its claim that Massachusetts has a public policy in favor of competent nursing care", *Boston Medical,* 260 F.3d at 24, which it detailed in its opinion.

Nonetheless, the Court concluded:

While these laws, regulations, and cases reflect a concern about the quality of nursing care in the Commonwealth, they do not establish a public policy prohibiting Hartney's reinstatement with the clarity demanded by *Eastern Associated Coal.* The Court found specifically in that case that the reinstatement of the employee who had tested positive for drug use "violates no specific provision of any law or regulation." *Eastern Associated Coal Corp.,* 531 U.S. at 66, 121 S.Ct. 462. Similarly, we have found no specific provision of Massachusetts law that would be violated by the arbitrator's order to

40

reinstate Hartney. In sum, Massachusetts does not have an "explicit, well defined, and dominant public policy, as ascertained by reference to positive law" that prohibits Hartney's reinstatement in these circumstances. *Id.* at 63, 121 S.Ct. 462.

*Id.* at 25.

The facts as found by the arbitrator in *Boston Medical* bear no resemblance to those in this case. But the analytical framework within which the Court addressed the reinstatement of the discharged nurse in *Boston Medical* does have application here. Simply put, just as in *Boston Medical*, the laws and regulations in the Commonwealth of Pennsylvania do not establish a public policy prohibiting Robbins' reinstatement "with the clarity demanded by *Eastern Associated Coal.*" *Id.*

Because the reinstatement of Ms. Robbins neither violates nor poses an express conflict with Pennsylvania law, the Buchheit Award ordering her reinstatement will be enforced, the Union's Motion for Summary Judgment on the question of the Award's enforcement will be granted and the cross-motion of the Hospital will be denied.

## C. The Union's Claim for Back Pay

The Union seeks back pay for the Grievant, arguing that "[t]he Buchheit Award was issued on April 26, 2013 with the expectation that the Grievant would be reinstated shortly thereafter. Reinstatement should have occurred, at the least, on June 13, 2013, when the Arbitrator denied the Hospital's Motion for Reconsideration." (Doc. 26, at 17). The Union thus argues that the Grievant should be granted back pay along with pre-judgment interest

to place her in the position she would have been in had the Hospital timely complied with the Award.

Ever since the Supreme Court's decision in *Textile Workers Union v. Lincoln Mills*, it has been a fundamental principle of federal labor law that Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, gives federal district courts jurisdiction over controversies involving labor contracts in industries affecting commerce and authorizes federal courts to fashion a body of federal law for enforcement of those collective bargaining agreements, including specific performance of agreements to arbitrate grievances. 353 U.S. 448, 456-457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

However, it is equally well established since the decision in *United Steelworkers of America v. Warrior & Gulf Navigation Company*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), that where the parties have included an agreement in their collective bargaining agreement to resolve disputes arising out of the terms and conditions of the collective bargaining agreement through final and binding arbitration that agreement to arbitrate must be enforced. Thus, the Court in *Warrior & Gulf* made clear that:

> [T]o be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

363 U.S. at 582-583.

Here, the Hospital and Union have clearly agreed to arbitrate all disputes arising out of their Collective Bargaining Agreement. Thus, in Article 4 - "Grievance Procedure" - Section 4.1 defines a grievance as "a dispute or complaint arising between the parties hereto, under or out of this Agreement or the interpretation, application or any alleged breach thereof, and shall be processed and disposed of in the following manner . . . ." (Doc. 28-1, at 5).

Thus, the question of whether the Grievant is owed back pay from an as yet unascertained date when, but for the Hospital's failure to reinstate her, she would have returned to work, is a dispute arising between the parties out of the interpretation and application of the CBA by Arbitrator Buchheit. The Union argues that this dispute can be resolved by the District Court. In support of this proposition, the Union cites principally to *United Steelworkers v. Adbill Management Corp.*, 754 F.2d 138 (3d Cir. 1985). In that case, the Circuit Court remanded the case to the District Court to resolve what it termed "the proper measure of damages which flow from the Hotel's noncompliance during the pertinent period." 754 F.2d at 142.

In *Adbill*, nine maids had been discharged for violating a work rule which prohibited employees from carrying handbags when working in the guest areas of the hotel. The Arbitrator concluded mitigating circumstances made the discharge too harsh a sanction and he, therefore, modified the discharges to suspensions without pay "until the date that arbitration award was received." The hotel was ordered to reinstate the Grievants to their

43

former position but without back pay. When the hotel refused to do so, the Union sought to

enforce the Award and sought damages for the hotel's failure to comply with it. The District

Court enforced the Award but remanded it to the Arbitrator to resolve the parties' disputes

regarding whether the maids had actually been reinstated, since the employer had placed

the names of the discharged maids back on the payroll but then immediately laid them off.

*Id.* at 140. The Circuit Court found the award was not ambiguous so that there was no basis

for a remand to the arbitrator:

> Despite the apparent disagreement between the parties, we do not consider
> the phrase "reinstate[ment] . . . to their former employment" to be ambiguous.
> Rather, we view the plain language of the award to clearly require that the
> nine discharged maids be returned to actual duty. Since we have determined
> that the award is unambiguous, the district court's remand to the arbitrator on
> the issue of reinstatement was improper.

*Id.* at 142. It, accordingly, remanded the damage question to the district court without further

explanation.

Further, it is worth noting that federal courts addressing similar situations have found

that:

> where "back pay" or other benefits are the subject of an initial award, and a
> dispute arises as to the nature or amount of the initial award, "the normal
> course of action is to treat the award as ambiguous and remand the dispute
> to the original arbitrator to clarify the award."

*Local 825 of International Union of Operating Engineers v. Tuckahoe Sand & Gravel*, 2007

WL 1797657, at *6 (D.N.J. 2007) (quoting *Aluminum Brick & Glass Workers v. AAA*

*Plumbing,* 991 F.2d 1545, 1549 (11th Cir.1993)).

In light of this case law, and the parties' CBA, the question presented is whether remand to Arbitrator Buchheit is required. This Court finds that remand is both necessary and proper. Unlike the arbitration award in *Adbill, supra,* where the arbitrator converted the nine maids' discharges to suspension without pay "until the date the arbitration award was received," 754 F.2d at 140, here Arbitrator Buchheit's Award provides no specific date or event on which the Grievant was to be reinstated. Thus, there is no date from which back pay may be calculated. In the same vein, it cannot be ascertained whether the Arbitrator intended that Roberta Robbins ever be granted back pay, no matter how long the delay in her reinstatement, or whether his decision to award no back pay was premised on an anticipated prompt reinstatement of Ms. Robbins, in which case back pay would begin as of that date if she were not reinstated. More specifically, the effect of the Hospital's failure to reinstate her and the Union's action to enforce the Award in response to that failure are events which bear on the Grievant's entitlement to back pay, if any, which are not addressed in the Buchheit Award and which present the kind of "latent ambiguity" which the Court in *Office & Professional Employees International Union, Local 471 v. Brownsville General Hospital,* 186 F.3d 326 (3d Cir. 1999), held provided a basis for remand to the Arbitrator. In *Brownsville,* the hospital suspended an employee for 60 days and conditioned his return to work on his agreement to undergo sexual harassment counseling. The grievant filed a grievance but agreed to undergo counseling. However, after attending eight sessions, a breakdown in the counseling relationship resulted in the grievant no longer

attending counseling sessions. The hospital then terminated the grievant for his violation of

the counseling condition upon which his reinstatement had been based. This termination

was grieved and submitted to arbitration. The arbitrator found that the hospital did not have

just cause to discharge the grievant but it did have the clear right to require him to continue

with the counseling process. The arbitrator ruled it was appropriate for the hospital to

prevent the grievant from working until he obtained proper counseling. 186 F.3d at 328-329.

After the issuance of the arbitration award, the grievant attempted to resume counseling but

the counselor with whom he had begun his counseling declined to continue in that

relationship. The union sought to resubmit the grievance directly to the arbitrator. The

hospital opposed this effort, on the basis that the arbitrator was without authority to revisit

the award. *Id.* at 330. The grievant then began to see another counselor. The hospital,

however, asserted that only counseling by the original counselor would satisfy the award

and, thus, refused to return the grievant to work.

In directing a remand to the arbitrator, the Court identified three recognized

exceptions to the prohibition against remand to an arbitrator:

(1) an arbitrator "can correct a mistake which is apparent on the face of his award"; (2) "where the award does not adjudicate an issue which has been submitted, then as to such issue the arbitrator has not exhausted his function and it remains open to him for subsequent determination"; and (3) "where the award, although seemingly complete, leaves doubt whether the submission has been fully executed, an ambiguity arises which the arbitrator is entitled to clarify."

*Id.* at 331.

The Court, quoting its prior decision in *Colonial Penn Insurance Company v. Omaha Indemnity Company*, 943 F.2d 327 (3d Cir. 1991), reiterated that a remand to clarify an ambiguity "serves the practical need for the district court to ascertain the intention of the arbitrators so that the award can be enforced," adding that the "limited purpose" of such a remand presents "not even a theoretical inconsistency with the *functus officio* doctrine." *Id.* at 331-332.

More important for purposes of this case, the Court added that:

[A] remand for clarification under such conditions is consistent with the policy of judicial restraint that is the thrust of federal arbitral jurisprudence because it gives the arbitrator the opportunity to clarify an award with respect to which *an ambiguity has arisen rather than forcing the court to interpolate its own estimate of the arbitrator's intent.*

*Id.* (italics added).

"[W]hen the remedy awarded by the arbitrators is ambiguous, a remand for clarification of the intended meaning of an arbitration award is appropriate . . . . Such a remand avoids the court's misinterpretation of the award and is therefore more likely to give the parties the award for which they bargained."

*Id.* (quoting *Colonial Penn*, 943 F.2d at 334).

In issuing the remand in *Brownsville*, the Court noted that "an essential element of the remedial scheme crafted by the arbitrator in this case – *viz.*, the direction that Abbadini continue his course of treatment 'as prescribed by Dr. Crabtree' – has proved unenforceable because after the entry of the award Dr. Crabtree declined to continue counseling." *Brownsville*, 186 F.3d at 332. Thus, the Court found an assumption in the award that was no longer accurate thereby creating an ambiguity requiring remand:

As the District Court noted, the arbitrator (though aware of tensions between Abbadini and Dr. Crabtree) entered his award on the assumption that Dr. Crabtree would continue to treat Abbadini. Because that assumption is no longer accurate, there is now an ambiguity, and the arbitrator should be permitted to revisit just so much of the award as pertains to the specific condition for re-employment in the light of this development.

*Id.* at 332-333.

Further, as in this case, the Court in *Brownsville* noted that the ambiguity was not

manifest on the face of the Award but, instead, was a latent one which nonetheless required

remand:

To be sure, this ambiguity is not of the kind that is manifest on the face of the award. Rather, the ambiguity is more in the nature of a latent one, which is no less a reason for remand under our precedent.

*Id.* at 333.

Here, a latent ambiguity has arisen after the entry of the Buchheit Award as occurred

in *Brownsville*. The Arbitrator may have entered his Award in this case on the assumption

that the Hospital would comply with it rather than fail to reinstate the Grievant and then

defend a subsequent action by the Union to enforce the Award. In such case, as the Union

has pointed out, the Grievant would have served a suspension of 14 months. Whether the

Arbitrator intended the Grievant to serve a suspension of that duration such that he would

grant back pay for any period after that date or whether he intended that the Grievant be

awarded no back pay for the resulting delay occasioned by the instant litigation presents an

ambiguity that clearly warrants remand.

48

Both the Hospital and the Union recognize the propriety of a remand to the Arbitrator, though not precisely for the same reasons. Thus, the Hospital has written that it "submits that, to the extent there is any issue regarding an appropriate measure of back pay, the matter should be decided by Arbitrator Buchheit on remand and that jurisdiction be restored such that he may also consider the Hospital's challenge to the nature of the remedy itself." (Def.'s Resp. in Opp. to Pl.'s Mot. for Summ. J., Doc. 29, at 21). The Union, while arguing that this Court has jurisdiction to "address the back pay dispute" (Doc. 26, at 17-18) argues, alternatively, that "if the Court wishes to exercise its discretion not to calculate the amount of back pay, it should remand this limited issue to Arbitrator Buchheit" (*id.* at 22). The Union requests in that circumstance an Order from this Court "to remove any dispute over the Arbitrator's jurisdiction to make the necessary calculation of back pay." (*Id.* at 22). It further argues in its Reply Brief that the remand to the Arbitrator must be a "limited one, i.e., simply to calculate back pay owing to the Grievant." (Doc. 30, at 17). It adds that "[t]here is absolutely no basis, as the Hospital requests, to restore jurisdiction to the Arbitrator to redetermine the reinstatement remedy." (*Id.*) With this statement the Court agrees. The Award reinstating Roberta Robbins is valid and not open to review or revisitation on remand by the Arbitrator. The Order accompanying this Memorandum forecloses any attempt by the Hospital to seek review by the Arbitrator on remand of the remedy of reinstatement. It is only the question of whether the Grievant is entitled to back pay, and, if so, from what date, that is the subject of the remand ordered by this Court.

## D. Pre-Judgment Interest

The Union seeks an award of pre-judgment interest. The Court has "discretion to award prejudgment interest in claims arising under federal labor law." *Kinder Morgan Bulk Terminals, Inc. v. United Steel, Paper and Forestry, Rubber Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union*, 9 F.Supp.3d 507, 522 (E.D. Pa. 2014) (citing *Glass Molders Int'l Union v. Owens-Illinois, Inc.*, 758 F.Supp. 962 (D.N.J. 1991) (citing *Ambromovage v. United Mine Workers,* 726 F.2d 972, 982 (3d Cir. 1984)). "Our Court of Appeals has guided our use of this discretion by counseling that prejudgment interest should be 'given in response to considerations of fairness' and 'denied when its exaction would be inequitable.'" *Id.* (quoting *Ambromovage,* 726 F.2d at 982).

"Prejudgment interest is usually available when the damages 'are ascertainable with mathematical precision'" *Id.* (quoting *Eazor Express, Inc. v. Int'l Brotherhood of Teamsters,* 520 F.2d 951, 973 (3d Cir. 1975)).

Here, the propriety of an award of pre-judgment interest cannot at this time be determined. Instead, it must await the clarification by Arbitrator Buchheit on remand as to the Grievant's entitlement to back pay, the date from which any back pay is to be calculated and the amount thereof. The Court will, therefore, hold the Union's request for pre-judgment interest in abeyance pending the decision of Arbitrator Buchheit on remand. The parties are directed to present the issue of pre-judgment interest to the Court within 14 days after the issuance of Arbitrator's Buchheit's award on remand.

## E. The Union's Request for Attorney's Fees

"In suits to compel one party to submit to arbitration or abide by an award, fees are generally awarded if the defaulting party acted without justification, or if the party resisting arbitration did not have a 'reasonable chance to prevail.'" *Chauffeurs, Teamsters and Helpers, Local Union No. 765 v. Stroehmann Bros. Co.,* 625 F.2d 1092, 1094 (3d Cir. 1980) (internal citations omitted); *see also, Mobil Oil Corp. v. Indep. Oil Workers Union,* 679 F.2d 299, 305 (3d Cir. 1982) ("Under the American rule, each party normally must bear the burden of its legal expenses, including attorneys' fees. One of the narrow exceptions to this rule is a finding that the losing party litigated in bad faith, vexatiously, or for oppressive reasons.").

A ruling on the Union's Motion for Attorney's Fees will be deferred until Arbitrator Buchheit, on remand, issues a final award on the limited issue of the Grievant's entitlement to back pay.

A separate Order follows.

Robert D. Mariani
United States District Judge